**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

REGINA ALLEN,
   *Plaintiff*,

*v.*         CASE NO. 13-CV-14106

COMMISSIONER OF     DISTRICT JUDGE VICTORIA A. ROBERTS
SOCIAL SECURITY,     MAGISTRATE JUDGE CHARLES E. BINDER

   *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

**I.  RECOMMENDATION**

  This Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (docket 14)

be **DENIED**, that Defendant's Motion for Summary Judgment (doc. 1) be **GRANTED**, and the

decision of the Commissioner be **AFFIRMED**.

**II.  REPORT**

  **A.  Introduction and Procedural History**

  Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to this magistrate judge for the purpose of reviewing the

Commissioner's decision denying Plaintiff's claim for a period of disability and disability

---

[1]The format and style of this Report and Recommendation comply with the requirements of Fed. R. Civ. P. 5.2(c)(2)(B). This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

insurance benefits (DIB), and supplemental security income benefits (SSI). The matter is currently before this Court on cross-motions for summary judgment.[2] (Docs. 14, 17.)

Plaintiff filed an application for a period of disability, DIB and SSI on April 12, 2011, alleging that she became unable to work on November 28, 2010. (Transcript, Doc.11 at 12, 161, 168.) Plaintiff's claims were denied at the initial administrative stages. (Tr. 81, 82.) On May 24, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Gregory Holiday, who considered the application for benefits *de novo*. (Tr. 29.) In a decision dated August 7, 2012, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from November 28, 2010, through the date of the ALJ's decision. (Tr. at 24.) Plaintiff requested Appeals Council review of this decision. (Tr. 7.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 23, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-4.) On September 26, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

## B.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "more than a scintilla . . . but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc.*

---

[2]The Court has reviewed the pleadings and dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

*Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports another conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)(citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc)(citations omitted)).

"Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a

party")(citations omitted); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

**C.    Governing Law**

Disability for purposes of DIB and SSI is defined as the:

[I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a)(DIB), 416.905(a)(SSI).

Plaintiff's Social Security disability determination is to be made through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).

4

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)(cited with approval in *Cruse*, 502 F.3d 532, 540 (6th Cir. 2007)); *see also Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)("[c]laimant bears the burden of proving his entitlement to benefits."). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. § 416.920(a)(4)(v), (g)); *see also* 20 C.F.R. § 404.1520(a)(4)(v), (g).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff meets the insured status requirements through December 31, 2015, and had not engaged in substantial gainful activity since November 28, 2010. (Tr. 14.) At step two, the ALJ found that Plaintiff's obesity, back disorder, asthma, bipolar disorder, schizoaffective disorder, dissociative identity (multiple personality) disorder and hypertension were "severe" within the meaning of the second sequential step. (Tr. 15.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. 15-17.) The ALJ found that the Plaintiff had the residual functional capacity (RFC) to perform sedentary[3] work as follows:

---

[3]

    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which

[T]he claimant requires a sit/stand option. The claimant cannot climb any ladders, ropes or scaffolds; can only frequently climb ramps or stairs; and can only occasionally stoop, crouch or kneel. The claimant cannot crawl, cannot constantly rotate, flex or extend the neck, and can only occasionally perform overhead reaching and handling. The claimant must avoid even moderate exposure to environmental irritants (such as dusts, gases, fumes and odors) and to poorly-ventilated areas; and must avoid all exposure to hazards like dangerous machinery and unprotected heights. The claimant is limited to simple, routine and repetitive tasks, and must be employed in a low-stress job defined as requiring no more than occasional decision-making with no more than occasional changes in the work setting, must have work that is not at a production rate or production pace. The claimant can have no more than brief, superficial interaction with the public and with co-workers and no tandem tasks. (Tr. 17.)

At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. 22.) At step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy and therefore she was not suffering from a disability under the Social Security Act. (Tr. 22-23.)

### E.    Administrative Record

Plaintiff was 43 years old at the time of the hearing. (Tr. 161.) She testified that she weighed 272 pounds. (Tr. 35.) Plaintiff testified that the last job she had was doing hair at home and she was self-taught and self-employed. (Tr. 37.) Until three months prior to the hearing, Plaintiff lived with her two sons and daughter. (Tr. 39.) After her home was foreclosed, she changed residences and her daughter continued to live with her. (Tr. 39-40.) Plaintiff reported that she had never lived alone. (Tr. 40.)

Plaintiff explained that she is able to take care of her own grooming, but needs assistance from her children to get in and out of the bathtub. (Tr. 41.) Her children do her laundry for her, but she is able to wash her undergarments in the sink. (Tr. 43.) Plaintiff testified that she is able to

_____

involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a).

6

drive and she drove to the hearing. (Tr. 44.) She described driving past the hearing building more than four times because there were no numbers on the building. (Tr. 45.)

Plaintiff is right-handed. (Tr. 45.)  She has a computer at home, which she uses sometimes, and she has an email account. (*Id.*) She described that she forgets the password for her account, and then remembers it at a different time when she is not using the computer. (Tr. 46.) She can use a cell phone and text simple messages. (Tr. 46.) Plaintiff testified that she had favorite television shows and she named them. (Tr. 56.) She also listed some of the DVDs she has and she said that she only watches comedies or dramas. (Tr. 56.)

Plaintiff testified that she recently dislocated her right shoulder. (Tr. 49-50.) Plaintiff had undergone a breast reduction surgery in the past. (Tr. 50.) Plaintiff testified that she has multiple personality disorder and the names of her personalities are Jade, Gea, Geena, Regina (who she explained was not an alternate personality because that was her name, "Regina"), Marie, and Schezi (pronounced "Sexy"). (Tr. 50-51.)

Plaintiff testified that she was able to work until November 2010, when she lost her only friend who used to keep her "on track." (Tr. 66.) She testified that it was then that she started psychiatric treatment and she said her medications have slowed her mood swings. (Tr. 67-68.) Plaintiff also testified that she has back pain. She has tried several things to relieve her back pain, including having her daughter sit on her back and bending over to touch her toes. (Tr. 53-54.)

Plaintiff testified that she worked at Allegra Direct between 2007 and 2009 and she was working there when she was charged with prescription fraud. (Tr. 60.) Plaintiff testified that she had attendance and disciplinary problems in that job and that she would sometimes go to lunch and not return; while she was gone "a different personality would have to kick in." (Tr. 61.) She testified that she was not terminated for attendance, but the job ended when she pled guilty for

attempting to pick up a controlled substance. (Tr. 52, 62.) Plaintiff testified that she was on probation for that offense. (Tr. 52.) She said that it was alleged that she "dropped off a fake prescription and went back in to pick it up" and that she has no recollection of that. (Tr. 59.) She explained that they investigated to find her "not guilty," but she "took the plea before they finished their investigation." (Tr. 60.)

She testified that prior to Allegra, she worked at a fast food restaurant and she lost that job when she did not remember she had a job and she did not come in or call in for an entire week. (Tr. 63.) Plaintiff described having cut all her hair off the week prior to the hearing, and not remembering it, but found her hair in the garbage. (Tr. 65.) She also testified that she ended up in a local park and did not recall why she was there. (Tr. 65.)

The medical records show that Plaintiff had a history of asthma and complaints of back pain due to her large breast size, causing neck and shoulder pain, with her bra leaving "deep gouge marks" in her shoulders. (Tr. 283-85.) In December 2009 she underwent a breast reduction. (Tr. 286-88.)

In November 2009 Plaintiff complained of headaches and underwent an MR angiography of the head. The result was negative. (Tr. 333.) There was no evidence of aneurysm or significant stenosis, "[b]ilateral internal carotid arteries [were] normal in course and caliber," anterior and middle cerebral arteries were unremarkable, vertebrobasilar arteries were normal and bilateral positive cerebral arteries were unremarkable. (Tr. 333.) Similarly, an MRI was negative. (Tr. 335.) On November 13, 2010, just prior to the alleged onset date, Plaintiff reported to the emergency room with an ankle injury, diagnosed as an ankle sprain. (Tr. 309-11.) She reported that she had tripped over her dog and twisted her ankle. (Tr. 313.) Additional medical evidence, including

mental health treatment and treatment for back pain is discussed in detail below where it is relevant to the analysis herein.

The ALJ found that Plaintiff had past relevant work as a customer service representative, hair stylist and general laborer. (Tr. 22.) The vocational expert ("VE") reported that Plaintiff's past work as a customer service representative was semi-skilled and sedentary in exertion per the Dictionary of Occupational Titles (DOT). (Tr. 263.) Her work as a hair stylist was skilled and light in exertion and as a general laborer was unskilled and medium in exertion. (Tr. 263.) The ALJ asked the VE to consider an individual of Plaintiff's age, education and work experience who is able to perform work at the light exertional level, further limited as follows:

> The person can occasionally climb ladders, cannot climb any ropes or scaffolds. Can no more than frequently climb ramps or stairs. No more than frequent stooping. No more than occasional crouching or kneeling or crawling.

> No constant rotation, flexing or extension of the neck. No more than occasional overhead reaching and handling bilaterally. The person must avoid concentrated exposure to environmental irritants, like dust, gases, fumes, odors and to poorly ventilated areas.

> The person must avoid all exposure to hazards, like dangerous machinery, unprotected heights. The person is limited to low stress jobs, and I would define that was (sic) a job calling for no more than occasional decision making, no more than occasional changes in the work setting. And finally, no more than occasional interaction with the public and with coworkers. (Tr. 73-74.)

The VE testified that such a person could not perform Plaintiff's past work. The VE gave several positions in southeast Michigan which such an individual could perform.

For the second hypothetical question, the ALJ asked the VE to consider the same limitations as set forth in the first hypothetical question, with the following changes:

> The person requires a sit/stand option in order to perform work. Instead of occasional climbing of ladders, this person can't even climb ladders. Instead of no more than frequent stooping, this person can perform stooping no more than occasionally.

And must have work that's not at a production rate or production pace. I recognize that there's some pace or level of pace to most jobs, but this is a restriction on the amount of pace. So, it has to be less than a production rate or production pace.

And finally, the person should have no more than brief, superficial interaction with the public and with coworkers, and no tandem tasks between the person and any coworkers. (Tr. 74.)

The VE testified that he would reduce the previous number of jobs to which he testified by 50 percent and but would reduce the small products assembler position to 3,000 jobs. (Tr. 75.)

For the third hypothetical question the ALJ asked the VE to assume the same limitations as the previous hypothetical, "except this person can perform at not more than a sedentary level of exertion. Also, instead of avoiding concentrated exposure to environmental irritants and poorly ventilated areas, this person must avoid even moderate exposure to those." (Tr. 75.)

The VE testified that such an individual could perform an inspector position with 2,000 jobs in the Southeast Michigan region and 180,000 in the national economy, representative DOT code 669.687-014, a sorter position with 2,000 jobs in Southeast Michigan and 120,000 in the national economy, representative DOT code 712.687-018, and a packer position with 1,500 jobs in the Southeast Michigan region, 140,000 in the national economy and representative DOT code 559.687-014. (Tr. 75-76.)

The VE confirmed that all of his responses to the hypothetical questions had given jobs that were unskilled and consistent with a limitation to "simple, routine and repetitive tasks." (Tr. 76.) In response to further questioning, the VE also testified that there would be no competitive employment for an individual who either would forget that she's suppose to go to work and would be unable to perform an eight-hour workday or 40-hour workweek with regularity or would need a job permitting her to be off-task for up to 25 percent of the workday. (Tr. 76.)

Plaintiff's attorney asked follow up questions regarding specific limitations. (Tr. 77-78.) The VE testified that anything beyond one to two absences per month would be work-preclusive, the most a person could be off-task during a workday and sustain employment was about 20 percent, and an individual's need to elevate her legs to table top height would preclude work. (Tr. 77-78.) In response to questioning by Plaintiff's attorney, the VE also testified that the sedentary level sorter position, as well as the packer position (dependent on what was being packed) could be performed one-handed. (Tr. 78.) He further testified that if the job required two hands and the individual needed to use a cane while standing to perform the job, then the individual would not be able to perform the job. (Tr. 78.)

### F.    Analysis

Plaintiff contends that the ALJ's finding that she had the RFC to perform simple, routine and repetitive low stress, sedentary work is not supported by substantial evidence. (Doc. 14 at 12.) Plaintiff also argues that the ALJ did not properly assess her credibility, including her complaints of pain and limitations. (Doc. 14 at 12.)

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports a different conclusion. *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006); *Mullen,* 800 F.2d at 545. The Court has reviewed the record in full and substantial evidence exists in the record to support the ALJ's conclusion that Plaintiff has the RFC to perform substantial jobs in the economy.

### 1.    The ALJ's Credibility Determination Is Supported By Substantial Evidence

Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence because it contains boilerplate language, inaccurately presented her activities of daily

living, and did not properly consider the reasons for her failure to seek consistent treatment. (Doc. 14.)  The ALJ is required by the Regulations to explain his credibility determination with respect to Plaintiff's symptoms. 20 C.F.R. §§ 404.1529,  416.929; *see also* SSR 96-4p and 96-7p. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witnesses's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence and contain specific reasons for the weight the adjudicator assigned to the individual's statements. *See id.*; SSR 96-7p. To the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). In addition to objective medical evidence, the ALJ must consider all the evidence of record in making his credibility determination. *See* 20 C.F.R. §§ 404.1529(c)(2), (3), 416.929(c)(2), (3); *see also Felisky*, 35 F.3d at 1039-41. Relevant factors to be considered include the following: daily activities, location, duration, frequency and intensity of pain and other symptoms, precipitating and aggravating factors, medicine including the type, dosage, effectiveness and side effects, treatment for relief of pain or other symptoms, any measures used to relieve pain, and "[o]ther factors concerning your functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3)(I)-(vii), 416.929(c)(3)(I)-(vii).

Plaintiff relies on *Dragon v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 454 (6th Cir. 2012), to argue that the ALJ's reasoning is insufficient because it contains the following "boilerplate" language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (Tr. 22.)

In *Dragon,* the ALJ had found Dragon's testimony "credible to the extent that such testimony is consistent with the above [RFC] assessment. To the extent that any such testimony was reflective of a greater degree of limitations, such testimony was not found to be credible due to a lack of objective medical support." *Id*. at 466. The *Dragon* court called the ALJ's language and reasoning "circular" and concluded that the "ALJ found Dragon's testimony credible to the extent it confirmed the ALJ's own conclusion. Thus, it appears the ALJ afforded Dragon's testimony no weight at all because the ALJ had come to its (sic) conclusion independent of the information from her testimony." *Id.*

*Dragon* is distinguishable from the instant case. There is no indication that the *Dragon* ALJ gave any additional reasoning for discounting Dragon's testimony and credibility. As indicated by both the ALJ's written decision in the instant case and Plaintiff's brief, in which she challenges several of the ALJ's specific credibility reasons, the ALJ gave multiple reasons for discounting Plaintiff's credibility and, while he may have used boilerplate language in conclusion, he included a full discussion of the evidence as it relates to Plaintiff's credibility in the multiple preceding pages and paragraphs of his decision.

The ALJ properly considered the record in full when making his credibility findings. The ALJ pointed out where the objective medical evidence did not support the severity of Plaintiff's

allegations of pain and mental and physical limitations. Despite Plaintiff's self-reports of her multiple personalities and mental health symptoms, the treatment notes show observations by her treatment providers that are not consistent with the severity Plaintiff alleges. (Tr. 20.) Plaintiff underwent an initial Psycho-Social Assessment on October 13, 2010, with a limited license master social worker. (Tr. 393-98.) Plaintiff's presentation, affect, mood and behavior were noted to be "unremarkable." (Tr. 397.) Her "insight and judgment appeared good." (Tr. 397.) Plaintiff reported an onset of multiple personality symptoms at 12 years old. (Tr. 393.)

Two months later, Plaintiff underwent an initial psychiatric evaluation with Daniel Appel, D.O., on December 7, 2010. (Tr. 402.) Plaintiff reported that her multiple personalities had been going on since she was ten years old.[4] (Tr. 402.) She reported a history of emotional, physical and sexual abuse from childhood. (Tr. 402.) She also reported having sustained a head injury in the past. (Tr. 395, 398.) Plaintiff denied a history of mental health treatment or psychiatric hospitalization. (Tr. 398, 402.) Dr. Appel diagnosed bipolar I disorder, most recent episode depressed, severe, post-traumatic stress disorder, dissociative identity disorder, and borderline personality disorder. (Tr. 405.)

In December 2011, a mental health treatment provider noted that Plaintiff informed her during a session that Plaintiff was "a different personality from her 'host'", yet the treatment provider noted that Plaintiff "was able to answer all questions coherently and she appears to have good insight into her life and personal life circumstances." (Tr. 431.) Insight and judgment were reportedly "good" and she was oriented X3. (Tr. 431.) In February 2011 Plaintiff reported that her

---

[4]At the hearing, Plaintiff testified that she first became aware of the multiple personalities in 2007 or 2008, when she received phone calls asking for one of her other personalities. (Tr. 64.) Her hearing testimony is consistent with the treatment notes from her treating physician Rhona A. Fingal, M.D., who noted Plaintiff's reported that her multiple personalities started in 2007 and that she thought it began "after her real adult depressed state." (Tr. 342.)

14

"multiples" were worsened by her housing and financial problems. (Tr. 450.) At the appointment, it was noted that she was not responding to internal stimuli. (Tr. 450.) Plaintiff's primary care physician similarly and consistently noted Plaintiff to be alert, oriented to time, place and person and in no acute distress at her examinations. (Tr. 452-65.)

On February 9, 2012, Plaintiff was observed to be "[c]alm, pleasant, coherent, neatly groomed and dressed, affect full range, psychomotor [within normal limits], splits, projects, dissociates." (Tr. 443.) She was often noted to have a "good rapport" with the treatment provider. (Tr. 20, 447, 448.) She was reported as "calm," even when otherwise noted to be "[exhibitionistic (sic)" regarding the "multiples."  (Tr. 449.) At an April 2012 appointment it was noted that Plaintiff was "[p]leasant, good rapport, calm, coherent, says her pcp suggested possible cymbalta here and pt says seeking pcp to write letter to get out of Work One program, intense borderline defenses, neg aims." (Tr. 441.)

With respect to Plaintiff's physical symptoms, the ALJ also considered the objective medical imaging and testing of record. In November 2010, Plaintiff was referred to a psychiatrist following complaints of feeling spirits touching her and talking to her. (Tr. 340-43.) An EEG was performed in January 2011 following Plaintiff's complaints of headaches and hallucinations. (Tr. 337, 340.) As the ALJ pointed out, the EEG was normal. (Tr. 18, 338, 352.) A February 15, 2011 MRI of the lumbar spine revealed an "[a]nnular fissure and mild protrusion eccentric to the left which abuts the intradural descending left S1 nerve root." (Tr. 20, 358.) The MRI and resultant diagnoses were taken into account by the consultative medical evaluator Clair Issa, M.D., on August 9, 2011, and by the ALJ when he formulated the RFC. (Tr. 20, 87, 91.)

The ALJ did not limit his consideration to the objective medical evidence. The ALJ also properly considered the effectiveness and side effects of Plaintiff's medication and other treatment.

His finding that the record did not show significant side effects from medication is supported by the evidence. (Tr. 21, 440.) The ALJ noted that Plaintiff had improvement with mental health treatment. (Tr. 19-21.)  He noted that Plaintiff's mental condition had declined while she was living in her car, yet showed improvement when she was in an apartment in April 2012. (Tr. 20.) The ALJ noted a Global Assessment of Functioning score of (GAF) of 30 when Plaintiff began treatment. The ALJ then pointed out the noted improvement from her 2010 intake until December 2011. (Tr. 20.) By December 2011, the social worker had assigned a GAF of 50. (Tr. 433.) In February 2011, Plaintiff had refused group therapy, saying that she "gets more confrontational in groups" with her multiple personalities and she also noted that her multiple personalities were worsened by her financial and housing problems. (Tr. 407.) By May 2011 it was noted that Plaintiff had said she may be ready for referral to group therapy at the next session. (Tr. 410.)

The ALJ also noted that she had improvement with medication. (Tr. 20.) For example, in December 2011, mental health records show that Plaintiff reported that her "medication helps control some of her symptoms. It keeps her calm and quiets the voices, helps her sleep, and reduces her crying." (Tr. 433.) The ALJ also cited Dr. Appel's report that Plaintiff refused to undergo labwork "because of mother's drug abuse-says will contemplate it at future date here-says will have pcp send information here." (Tr. 405.) The doctor noted that Plaintiff tends to drug seek Xanax and he discussed not recommending "benzo" for her addictive history. (Tr. 406.) He prescribed risperidone, Remeron and trazadone. (Tr. 405.)

With respect to Plaintiff's physical pain, the ALJ cited the use of prescribed narcotic pain medication. (Tr. 20.) After a course of physical therapy, Plaintiff continued to have low back pain for which she took Vicodin, Robaxin and Vicodin Extra Strength. (Tr. 382.) He considered her attendance at physical therapy. The record shows that Plaintiff was prescribed physical therapy

for her low back pain. (Tr. 359.) She was evaluated on November 18, 2010, and discharged on January 10, 2011. (Tr. 359.) She attended 6 out of 12 sessions. (Tr. 359.) In November 2010 it was reported that Plaintiff "had only attended three sessions secondary to personal illness and weather causing her to cancel several visits." (Tr. 361.) "Functional improvements" were noted with the home program performance, yet "no other functional progress [was] noted secondary to limited attendance with physical therapy." (Tr. 361.) On the January 2011 discharge date it was reported that Plaintiff had increased range of motion and strength improvements with "minimal changes noted throughout therapy with pain management for improved ability to drive and squat for lifting and carrying." (Tr. 359.) It was concluded that she had made "steady progress with respect to range of motion and strength with physical therapy" yet lumbar and thoracic back pain continued to be the primary limiting factor. (Tr. 359.)

In response to the ALJ's consideration of Plaintiff's failure to seek medical examination and consistent treatment, Plaintiff argues in her brief that she did not have medical insurance and her home was foreclosed. (Tr. 21.) The record, however, shows that Plaintiff had insurance and/or Medicaid during much of the period to which the ALJ refers. In the October 2010 initial Psycho-Social Assessment, it is noted that Plaintiff has income and medical insurance and was able to maintain her own appointments. (Tr. 399.) In the December 2011 annual Psycho-Social Assessment, it was noted that Plaintiff had no income, was unemployed, yet had Medicaid health insurance. (Tr. 425, 433.) It was not until 2012 when it was noted that Plaintiff reported having no insurance. (Tr. 442.) The ALJ did not err in considering Plaintiff's compliance with and commitment to treatment.

The ALJ also considered the extent of Plaintiff's activities of daily living. He cited Plaintiff's daily activities including "driving a motor vehicle, going to the local gas station,

washing laundry items by hand, and an ability to prepare simple meals." (Tr. 21.) Plaintiff argues that the ALJ overstated these activities and that they are more limited than the ALJ's analysis concludes. The evidence on which the ALJ relies is supported by the record, and even if they were performed at limited levels, as Plaintiff alleges, these were not the sole basis of the ALJ's credibility determination. The ALJ also cited other daily activities throughout the decision, including Plaintiff's testimony that she can use a computer and has an email account and is able to use a cell phone and engage in simple texting.  (Tr. 18.) Plaintiff reported at one of her appointments that she has three friends with whom she has strained relationships, yet they talk on the phone and communicate via text messages. (Tr. 428.)

The ALJ noted an inconsistency between Plaintiff's testimony at the hearing that she needs some assistance with bathing, and her May 25, 2011 Function Report in which Plaintiff reported no problems with any of the listed personal care tasks, including bathing. (Tr. 18, 238.) She did report that her children would sometimes remind her to wear her wig if she was attending an appointment or someone stopped by. (Tr. 239.) These responses are consistent with the Function Report completed by one of Plaintiff's sons, in which he, too, noted Plaintiff needed no assistant with personal care, yet sometimes needed a reminder to put her wig on after she had shaved her hair off. (Tr. 246-47.) At an initial Psycho-Social Assessment on October 13, 2010, Plaintiff reported needing no assistance with activities of daily living. (Tr. 399.)

With respect to caring for her children, Plaintiff in her brief argues that statements in the decision that she cares for her children are in error. She argues that the children are adults and she does not provide care for them, but that they provide care for her. While the children are now grown, there is evidence of record to support either conclusion. Plaintiff's son completed a function report, cited by the ALJ, in which he reported that he and his siblings "take care of

everything" for his mother around the house and yard. (Tr. 18, 247.) In other documents, Plaintiff has reported the care she provides for her children. For example, Plaintiff reported in May 2011 that she takes care of her children and makes "sure they have the bridge card to go buy food." (Tr. 238.)  She reported that noone else helps her care for them. (*Id.*)

With respect to driving, Plaintiff reported that she drives and she is able to go out alone. In the same form, she reported that her children take her keys after dark because if she listens "to the spirits that taunt" her, she will drive and go someplace she does not "know of."  (Tr. 240.) She blames this on her personality called "Gia." (*Id.*) In a December 2011 Psycho-Social Assessment, Plaintiff reported that her ADL's included "taking kids to school or work and picking them up." (Tr. 425.)

The record is inconsistent as to whether Plaintiff prepares her own meals or cooks. Plaintiff reports that she does not cook, because of the time it takes; she also reports that she will prepare food "monthly," when she knows her "food is safe" she will "cook a pot of rice." (Tr. 239.) Her son reported that she eats only "ice and candy bars, she says it's healty (sic) food for 'Gia' her other personality," and she "never" cooks because she "refuses to use fire."  (Tr. 247.) At the hearing, Plaintiff testified that she does not cook, but she may cook a hot dog or rice, "something very quick." (Tr. 41-42.) She testified that she can slice cucumbers and eats those and carrots. (Tr. 43.) The ALJ pointed out that Plaintiff had testified that she is trying to lose weight but she eats meals consisting of chips and soda. (Tr. 18.)

In considering Plaintiff's credibility, the ALJ pointed out inconsistencies in Plaintiff's description of her legal issues. (Tr. 19.) She was on probation for picking up a fraudulent prescription and her explanations vary in the record. (Tr. 19.) At the hearing she testified that she had no memory of it. (Tr. 19, 59.) She reported to Dr. Appel that she was on probation after

attempting to receive a fraudulent prescription and had a history of a suspended driver's license for tickets. She reported picking up a fraudulent prescription for oxycontin from the drug store for a relative. (Tr. 403.) The ALJ did not err in considering the inconsistencies and Plaintiff's probation for fraud-related charges. *See Jackson v. Barnhart*, 2008 WL 1848624 at *11 (W.D.N.Y. Apr. 23, 2008)("[P]laintiff's own admitted misrepresentation concerning her educational background and her previous conviction for welfare fraud affect her credibility . . . . Although plaintiff alleges that this conduct was attributable to her condition . . ., there is no medical support for this contention in the record, especially since the alleged onset of her disability was in 2001, long after her 1984 welfare fraud conviction.").

Plaintiff argues in her brief that the ALJ applied a "sit and squirm" test to Plaintiff when the ALJ noted in his decision that he had "observed the claimant carry her cane into the room; and standup to give her oath, without the assistance of the cane." (Tr. 20.) The ALJ further noted that "[t]his is not to say that the claimant doesn't require the use of a cane. It does suggest that she may need to use a cane for extended ambulation which is accounted for in the residual functional capacity assessment." (Tr. 21.) The ALJ did not err in mentioning his observations, where he relied on a variety of other evidence in the record to discount Plaintiff's pain and limitations. *See Weaver v. Sec'y of Health and Hum. Servs.*, 722 F.2d 310, 312 (6th Cir. 1983)("While we recognize that observation and credibility are factors in this complicated equation, and as such are material, relevant, and admissible, we cannot allow the dismissal of a claim for pain solely on the ALJ's observations at the hearing. This procedure amounts to the infamous and thoroughly discredited "sit and squirm" test. We do not imply that there was no evidence in the record from which the ALJ could not draw the inference of a lack of pain. However, the ALJ must cite some other evidence for denying a claim for pain in addition to personal observation.")

20

The ALJ's findings that question Plaintiff's need for a cane are otherwise supported by the evidence of record. In Plaintiff's May 2011 function report form, a question asked whether she uses "any of the following" including both a "cane" and "glasses/contact lenses." (Tr. 243.) Plaintiff reported wearing glasses, but did not report using a cane. (Tr. 243.) This response is consistent with her son's response; he similarly did not report the use of a cane. (Tr. 251.) In the December 2011 annual Psycho-Social assessment, it was reported that Plaintiff had no need for mobility assistance. (Tr. 426.) At a February 6, 2012 appointment with her treating physician Plaintiff reported the following: that she was seeing a pain specialist who was going to give her facet joint injections at T9-10, that the doctor gave her a script for a standard cane, and that a breast revision surgery had to be cancelled due to clerical issues. (Tr. 455.) The record does not contain a prescription for a cane; it contains only Plaintiff's report that a cane had been prescribed by another doctor.[5] (Tr. 455.)

For all these reasons, I suggest that the ALJ properly explained his findings regarding Plaintiff's credibility, including the extent of her alleged symptoms, including pain, and her physical and mental limitations. As a result, the ALJ's credibility finding is supported by substantial evidence in the record.

## 2.   The RFC Properly Accounted for Plaintiff's Mental and Physical Limitations in the RFC

Plaintiff argues that the ALJ failed to properly assess her mental limitations and therefore, the resultant hypothetical questions to the VE, as well as the RFC, were flawed. She argues that,

---

[5]The record shows additional inconsistencies in Plaintiff's reports amongst her doctors. At her April 12, 2011 mental health appointment, Plaintiff reported that she had undergone an EEG which showed no seizures, but she also reported that the brainwaves had been "abnormal-non specific." (Tr. 448.) The January 2011 EEG findings were normal. (Tr. 337-38, 351-52.) In January 2012 Plaintiff also reported to her treating physician that her pain doctor had suggested a possible diagnosis of fibromyalgia. (Tr. 457.) There is no evidence of underlying signs or symptoms to support the diagnosis Plaintiff asserts.

as a result, the ALJ's findings at step five were not supported by substantial evidence. (Doc. 14.) The ALJ followed the prescribed rules for evaluating Plaintiff's mental impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ properly measured the severity of Plaintiff's mental disorder in terms of four functional areas, known as the "B" criteria, by determining the degree of limitation in each area. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ determined that Plaintiff has moderate limitations in activities of daily living, moderate limitations in social functioning and moderate limitations in maintaining concentration, persistence and pace and that there have been no episodes of decompensation. (Tr. at 16.) In making these findings, the ALJ considered the medical opinions and other evidence of record, including Plaintiff's testimony and reports. (Tr. 16-21.) The ALJ gave reasons to support the limitations set forth in each of the areas of functioning. (Tr. 16.)

Plaintiff argues that the August 4, 2011 Mental Residual Functional Capacity Assessment (MRFC) completed by consultative medical evaluator Kathy A. Morrow, Ph.D., is inconsistent with the remainder of the record. (Tr. 91-93.) Plaintiff also argues that Dr. Morrow's statement that "Clmt. [Plaintiff] has demonstrated the ability to perform work activity, having been employed from 1993–2010," is irrelevant to her ability to perform work activity since 2010. (Doc. 14.) As Defendant points out in response, this evidence becomes relevant only in that Plaintiff alleges that her mental symptoms developed in childhood, and therefore, she has maintained employment with these mental conditions in the past. Neither Dr. Morrow nor the ALJ use the past work history to conclude that Plaintiff remains able to engage in the same level of employment as before her alleged onset date.

Dr. Morrow's opinion shows that as the complexity of instructions increases, so too do Plaintiff's limitations in performing work activity. (Tr. 91-93.) Despite Plaintiff's argument to the

contrary, moderate limitations in specific areas do not necessarily equate to disability or preclude work. As stated on the MRFC, "the actual mental residual functional capacity assessment is recorded in the narrative discussion(s) in the explanation text boxes." (Tr. 91.) Dr. Morrow concluded that Plaintiff "retained the mental capacity to sustain an independent routine of simple work activity. [She] can tolerate low stress social demands and adapt to simple changes in routine. [She] may be limited in meeting more complex and detailed work demands." (Tr. 93.)

The ALJ included non-exertional limitations within the RFC to address Plaintiff's mental limitations. For example, she is limited to brief and superficial interaction with both the public and co-workers, thus lessening social demands. She is limited to no more than occasional changes in work setting, with no production rate or pace work and no more than occasional decision making. Tasks must be simple, routine and repetitive. (Tr. 17.) The ALJ's RFC is supported by Dr. Morrow's opinion.

With respect to the remainder of the RFC, the ALJ's findings are supported by the evidence of record, including the opinion of Dr. Issa. Dr. Issa had the benefit of Plaintiff's lumbar spine MRI in her review. (Tr. 91.) After a review of the record, Dr. Issa opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours of an eight-hour workday and sit about six hours of an eight-hour workday, could only occasionally climb ramps, stairs, ladders, ropes and/or scaffolds, may frequently balance, occasionally stoop, kneel, crouch of crawl. (Tr. 90.) She opined that Plaintiff had no manipulative, visual or communicative limitations, but must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 91.) After consideration of the full record, the ALJ's RFC contains physical limitations more restrictive than those opined by Dr. Issa.

Thus, I suggest that the ALJ's RFC is supported by substantial evidence. In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Serv.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The VE's testimony is substantial evidence supporting the ALJ's finding that Plaintiff could perform a substantial number of jobs in the economy. The ALJ's findings at step five are supported by substantial evidence.

**G.      Conclusion**

The ALJ's decision to deny benefits was within the range of discretion allowed by law, it is supported by substantial evidence and there is simply insufficient evidence to find otherwise. Defendant's Motion for Summary Judgment (doc. 17) should be granted, that of Plaintiff (doc. 14) denied and the decision of the Commissioner affirmed.

**III.      <u>REVIEW</u>**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985);  *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan,* 474 F.3d at 837 (*citing Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  E.D. Mich. LR 72.1(d)(3). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
United States Magistrate Judge

Dated: October 7, 2014